Good morning, everyone. The first argued case, or group of cases this morning, we have consolidated. The appeals are Ultratec, Inc. v. CaptionCall. Ms. Noll, we encourage you, and I imagine that you're planning to talk first about the specific areas that are common to all of these cases, and then to point out to us, as far as the distinctions among them are concerned, to make sure that we know what you think are the most important issues. Fair enough, Your Honor. Okay, proceed. May it please the Court. My name is Kristen Noel. I'm from the law firm of Coralton Brady in Madison, Wisconsin. I'm appearing on behalf of the appellant, Ultratec, with me at counsel table is my partner, Martha Snyder. Within and across these nine appeals, Ultratec has raised a wide number of issues with the PTAS handling of the IPRs. We obviously won't have time to hit upon all those issues, but time permitting, I'm hoping to at least, subject to the Court's question, touch upon secondary considerations of non-obviousness, the construction of trained-to-the-voice, because that term is recited in six of the eight patents, and the construction of captioned telephone device, as that term is specifically used and claimed in the 082 patent. I will note that globally, the one common thread with all these various issues that Ultratec has raised with the PTAB, is that the PTAB, at least in these matters, didn't act as a neutral arbiter. It didn't always put the proper burden on the petitioner. Why don't you start with the procedural infirmity that you allege in the PTAB's refusal to allow you to supplement the record with Mr., and tell me if I say his name wrong, Ochiogrosso? I believe it's Ochiogrosso. Ochiogrosso? Ochiogrosso. Ochiogrosso. Okay, I'm not going to get it right. But in any event, why don't you explain to me why you believe there was a procedural infirmity, and please tell me the facts. I want to understand the facts of what happened, because I think, unless I'm mistaken, this procedural issue extends and covers all of the cases in front of us today. It does indeed. It certainly impacts some patents more than others, because there were some inconsistent statements that the board did not allow Ultratec to even offer to the board. The board, to this day, still hasn't read them. And that would specifically refer to the McLaughlin reference and the Ryan reference. But just to be clear, as I understand your argument, because the board extensively and repeatedly relied on the credibility of this particular expert in every one of the proceedings before it, I mean, it wasn't even if they had refused to allow the inconsistent testimony, that could have been a harmless error if they had then gone on and decided this case without reference to the expert. But, in fact, in this case, they, in dozens and dozens of places across these eight things, said, we rely upon and credit the testimony of. And, in fact, they even said in multiple places, in particular regarding McLaughlin, and then another case, that they credit that testimony over the opposing expert. That's exactly correct, Your Honor. So if he really did sort of implode on cross-examination and offer inconsistent testimony, even if it was only with regard to one patent, your argument, as I understand it, is that would be an infirmity, though, because of their reliance on his credibility across all patents. Absolutely, Your Honor. And so laying the factual framework that Your Honor asked for, these IPRs didn't come out of thin air. There was an underlying lawsuit in the Western District of Wisconsin where Ultratech asserted these eight patents. And then the companion IPRs were filed by Sorenson and CaptionCall, which is their arm that competes with Ultratech. And so Mr. Ochiogrosso was obviously cross-examined at trial regarding what these prior art references actually taught. Did you not have the opportunity to challenge his testimony through the normal process in the IPRs? So certainly Ultratech had the opportunity to depose him. I believe only the very last IPR related to the patent Claim 6 and 8 of the 835 patent, which is in Appeal 1713. I believe that's the only deposition that was taken after the inconsistent trial testimony. I just want to be clear about that. So you couldn't, in these other cases, you couldn't depose him after he offered this inconsistent trial testimony in the IPR because the period of time for that discovery had closed? Correct. And in fact, you know, the Ultratech moved the PTAB for Leib to file its motion to supplement. We call it the two-part process. We can't just submit the testimony and say, please supplement the record with this testimony. We're prohibited by the PTAB to do so. So we filed a motion for Leib to file a motion. When we cannot get into the substance of the testimony, the substance of the evidence. He tried to, and was all stricken from the record. Correct. I just want to be clear here. In the normal process in an IPR, Mr. Ochoa Gross' testimony or deposition, I'm sorry, declaration was submitted. Correct. And I assume you had an opportunity to challenge that. We did indeed. In the IPR, in the normal course. That's correct. However, his inconsistent testimony at trial before Judge Crabb occurred after that deposition. I understand that, but I guess what I'm asking you is, did you not have the opportunity to attempt to obtain the similar inconsistent comments from Mr. Ochoa Gross? In the normal process. Indeed, Your Honor. Could you depose him in the IPR? He was deposed in the IPR. The IPR's rules on depositions are fairly limited, and we are very time constrained. Did you not have the opportunity to challenge him and say to him, but does this reference contain that element or not? Or don't you agree that this element is missing? The same kind of testimony that came out in the trial. I agree with you, and we did use that opportunity. However, as the facts came out, when Mr. Ochoa Gross was on the stand in front of the judge, in front of the jury, he made inconsistent statements with that deposition. He didn't implode during the IPR deposition. He held firm. But then with regard to the same issues on the same patent, in the parallel district court proceeding, everything went haywire for him, let's say. I'm not sure I would say he imploded, but he made important inconsistent statements. Well, I can't know whether he imploded because I'm not allowed to see the inconsistent statements, right? That's correct, and that's where we don't just have a violation of the PTAB's own rules. And we do disagree with the PTAB and caption call. The section cited, 37 CFR 1.2, certainly does apply to IPRs. But in addition from that, the fact that PTAB, even if they have the right to waive and did, even if this rule didn't apply, the fact that they engage in this conduct to prevent you as the reviewing court from not only reviewing that evidence, you can't just decide whether their denial of the motion for leave was there, but you can't decide how that would impact the merits of their decision. When they denied you the right to file the motion with the evidence, they gave no explanation as to why. Did they give you an explanation on the conference call, even though there is not a written record of it? Can you report to the court what they said to you in the conference call? Yes, Your Honor. It was a very short call. We were given very limited opportunity to state our argument before you were put on mute, on hold. When the panel presumably discussed the issue, they came back and said, your motion is going to be denied. It's untimely. I think you said they suggested they would follow with a written order at that time? They did, and that written order did exist. They said that, but then there was no written order, correct? Not for quite some time until we subsequently moved to PTAB for further action once again. For consideration? Correct. And then there was a written order which spanned about seven sentences and likewise gave no explanation for the denial. Is that correct? That is my – yes, correct. Why don't you pull it out? Why don't we find it and look at what it says? I think I'll help you. I don't know which of the random appendices, but 6394 is the only thing I could find that represented an articulation by PTAB as to why they refused to allow you to supplement the record with potentially inconsistent testimony on the same point with the same witness. 6394. I guess it's in IPR, perhaps 2013-550. Thank you, Your Honor. That's mine. So what reason do they give, if any, in their denial? Because I don't even see anything in there that reflects kind of like what's in their brief today about how it was one of the eve of the hearing or something. I don't even see anything at all in this denial, any reason whatsoever. That's correct, and that is part of the basis of our objection to this practice, Your Honor. And, you know, as far as to the very curt explanation of timeliness, we attempted to submit this testimony within one week of it being made on the stand. I didn't understand them to – do you understand the PTO to suggest that you didn't timely submit the evidence? I didn't understand that to come from their brief. I thought they actually asked you to time it. Do you understand them to be disputing that? All I can say, Your Honor, is that that is the only curt explanation we received on the original phone call. So this is part and parcel with one issue that we think is global throughout our appeal of the PTO not acting like a neutral arbiter in these matters. They didn't put the proper burden on the petitioner, but rather acted as an advocate at every turn for invalidity. And it even occurred, Your Honors, when the petitioner itself did not advocate for certain evidentiary positions, certain evidentiary positions that ended up being material to these decisions. Of note is how the board treated objective indicia of non-obviousness. This isn't a case about an incremental improvement to a widget or a system. Throughout these – through these eight patents, Ultratech laid the blueprint for a groundbreaking product and service that truly revolutionized the quality of life for hundreds of thousands of Americans, the hard of hearing in the United States. Before CapTel, there was no captioning telephone service available to them. So Ultratech put in evidence through the preeminent experts in the field. Brenda Batot, the country's leading advocate for the deaf and hard of hearing, testified that CapTel was life-changing. She said it was life-altering and life-saving for the community. She represented – she was executive director of the Hearing Loss Association of America for nearly 20 years. Stated another way, more in a legal rubric of secondary considerations, this was a breakthrough of substantial dimension when it was unveiled. She wasn't conclusory in her statement. You say it was a breakthrough. What stage of the technology – to what stage do you attribute the breakthrough? So the breakthrough went from where we had traditional relay service where a deaf or hard of hearing person had to use a TDD or a TTY machine and type. It went to a relay. Someone working at the relay would read what they typed, call the doctor, whoever they wanted to call, and read the text to them. The doctor, whomever, would speak through this person who had to be in between the people on the caller and then type it back to the assistive user. That's what was available primarily to those who were deaf and hard of hearing. Did the board understand at this point the technology of the translation from voice to text without going through the keyboard? That was not an invention of Ultratech, was it? Certainly, Ultratech did not invent voice recognition software. Whether this comes to the court, is it not, of the merit setting aside this significant procedural concern? Yes. And so there was not any – certainly one embodiment of the prior art, even the prophetic aspirations of those who wrote the prior art patents. No one before Ultratech and Mr. Engelke ever conceived of a product and service that brought all of these inventions together. But to Judge Newman's point, isn't that the natural evolution that followed from the fact that the voice recognition software had been developed and commercialized and was available? Sort of the next natural step, instead of the operator having to type, just use the speech recognition software. Well, I would disagree with Your Honor because even in the most prophetic examples of where people wanted to use voice recognition software, there was never the conception that voice recognition software should be used by a call assistant using voice recognition software trained to the voice of that call assistant. None of the prior art references combine all together with that example. And had it been that easy, someone else would have done it. And so that's when we have to guard against the bias of hindsight. Yeah, this makes sense. This is such a great product. But no one else had done it. And that's why secondary considerations of non-obviousness are so important in this case. Now, the board took issue with Ultratech's evidence of secondary considerations largely on the issue of embodiment. And they said that Mr. Ludwig, our technical expert, who actually all these features, let's say revoicing and faster captions and all the advantages of Captel, he tied those features to the specific claims and he submitted claim charts. And the board looked at them and he said, this is too conclusory. And they said it was too conclusory on the issue of embodiment. And what's notable about that is CaptionCall never questioned or challenged embodiment. Aside from the fact that Mr. Ludwig's observations, he went to a call center. He saw a call assistant. He saw a microphone. He saw her revoicing all the words. He looked at a captioned telephone. He saw the captions come across. These are all observable facts that certainly Mr. Otrioboroso inspected and never once said, no, that's not true. Captel doesn't practice this invention because of X, Y, and Z. They don't even feign to argue that. Only the board took issue with that. And that is an improper step under this court's PPC, I believe, decision, where if you have undisputed evidence of embodiment, it's improper for the board to step in and say, uh-uh-uh, I don't believe you. So that is what happened in this case. Certainly CaptionCall took issue with nexus, but quite ironically for the issue of embodiment, they said, well, Captel practices a commercial product, actually practices all of these patents, but not all the patents cover all of the features. So that was their complaint on nexus. But it's reliant on the fact that the Captel product, in fact, embodies all of these claims. Probably a more glaring example happened in the last IPR concerning patent 835, claims 6 and 8, where the board actually went further and looked at some of the secondary considerations, including commercial success. And once again, Ultratech submitted the minutes of traditional relay service high to low as soon as Captel comes out and the trajectory of minutes skyrocketing for CaptionTelephone. And we submitted, Mr. Ludwick submitted the official reports that go to the government that are the basis of how these two companies even get paid. No one challenges the veracity of these reports. CaptionCall never questioned Mr. Ludwick what minutes go to CaptionCall, what minutes go to, or rather CaptionTelephone versus what minutes go to traditional relay service. But the board did. The board looked at the document and said, oh, I see a reference to Captel VCO that Mr. Ludwick attributes to CaptionTelephone. That's not CaptionTelephone. That's the prior art. That's voice carryover. No, board, it's not. And CaptionCall never suggested it because they know it's not true. On a motion for rehearing, we pointed this all out to the board. You misread these documents. Even CaptionCall would admit they show exactly what Mr. Ludwick says it shows. And the board said, oh, you should have anticipated our confusion, and we're not convinced anyway. You should have supplied more documents, more than the 75-page report that goes to the government. Ms. Noel, can you spend a few minutes talking about the anticipation by Ryan and the claim construction of the trained-to-the-voice-of-the-call assistant issue, please? Thank you, Your Honor. So the 082 ‑‑ oh, I'm sorry. Trained-to-the-voice. This does cover claims in six of the patents, so I'm glad Your Honor raised it. A limitation of claims of these patents relates to revoicing with voice recognition software that is trained-to-the-voice-of-the-call assistant. This is a central inventive aspect of the Ultratech patents. The proper construction of trained-to-the-voice-of-the-call assistant is just what those words say, the call assistant, one call assistant. And the specification clearly lays out why that's so important. And the claims all relate to the call assistant. Now, this is material because the board didn't find a disclosure in Ryan under the proper construction. The board rather said, well, the call assistant could be a voice pattern of a whole group of call assistants, despite the plain reading of that claim. Now, broadest reasonable interpretation is broadest, but reasonable is the key term there. And as the court found in PPC Broadband, if the construction isn't reasonable, it doesn't even meet DRI. So the claim language and the specification dictate. The claim language all says the voice of the call assistant. The board said, well, the call assistant refers back to a call assistant, and that can mean one or more. It's the distinction you're trying to draw here between the claim, which calls for training to the voice, versus design to the voice, which is what Ryan says. Correct. And the distinction you're trying to make is that training means some sort of iterative process, a learning process, whereas design is a fixed, coded procedure that doesn't involve any training. That is exactly right, Your Honor. But even without that, the fact that the software has to be trained to a specific person, the patent often refers to the particular call assistant, is really important. And the patent only— It just can't mean just one person. Oh, it does indeed, Your Honor. I mean, it could be any one of the group of people sitting in this courtroom. That's absolutely correct, Your Honor. Voice recognition software that is speaker-dependent is written in such a way that you actually sit down with it, and for hours, if not days or weeks, you work with it, and it learns the pattern of your voice. It learns how you pronounce things, and it gets better. But then how does Ryan operate when it's designed to recognize the voice of a call assistant? So another type of— Doesn't that mean it's at least trained once? Well, it's coded that way. So at the lab— Coded, but how do you write software to recognize a voice without the voice being taught to the software? Your Honor, the prior art actually does show this. They, through the magic of software writing, they write it to recognize, like, southern accents or something. And I'll note the distinction between Ultratech and Ryan. If Ryan actually says, designed to recognize the voice of particular relay agents, plural, the accuracy of the relay service may be improved by having one of these agents listen and call. This is clearly designed for multiple people. But let me read you— But it sounds to me like there is an element of teaching involved. It may not be after the fact, and it may not be iterative to whoever is speaking at the time. It's hard-coded forever, and it doesn't work in a call relay. The patent specifically teaches— I'm quoting from Appendix 1706 at Appendix 3693, which is the 482 patent in Column 5. It is a limitation of currently available speech recognition software that the software must be trained or adapted to a particular user before it can accurately transcribe what words the user speaks. Accordingly, it is envisioned here that the call assistant operates at a computer terminal which contains a copy of voice recognition software package, which is specifically trained to the voice of that particular call assistant. There could not be a more clear teaching in this specification that what Mr. Engelke, what Ultratech was envisioning and limiting themselves to was voice recognition software that would be trained to the voice of each and every call assistant. So you're challenging the board's conclusion that says, we do not agree the recited trained voice recognition software precludes training during software design, which the patent owner acknowledges is disclosed by Ryan. We made no such admission, and we vigorously dispute that. In fact, that was the whole predicate of our argument. That type of, you could train it during coding, during designing, goes exactly against what I just read in the specification. You would have to do that. You would redesign your software with every new call assistant. These call centers have hundreds of people working in them, and they're young college kids. The notion that you would take this invention and redesign your software, recode it every time, instead of buying the software disclosed in the specification, drag in NaturallySpeaking, which is adaptable. With each, you don't rewrite the code. You have your call assistant. You train them to work with the software. It learns their voice. That is what trains the voice of a call assistant. Let's save the rest of your rebuttal time and let's hear from the other side. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, that Vick Shaw for ad ploie caption call, my colleague, Louise Chen for the bench, and after me, it will be counsel for PTO arguing. Thank you, Your Honor. Maybe I should start with the process issue that came up first in the other side's argument. I'd like to make a couple points about that just to clarify exactly what was going on in the proceeding. Now, what the PTO does, it has this conference call procedure. So if someone wants to submit supplemental information, when you're well into the IPR proceedings, including after discovery is closed, what the PTO does is it schedules a conference call so that the side wanting to submit that evidence can make the best case as to why that evidence is material enough to warrant potentially having to delay the hearing. And just to put this in context. The evidence in question is not presented at that time. It is not presented in writing, but what happens during the conference calls. Or attached. Correct, Your Honor. Specifically excluded. At the time of the conference call, that's right. They do not submit that evidence. But what the PTO does, it has a hearing, as often happens in district courts, and it allows the counsel to say, tell us what, in your words, is so material about this conflicting testimony. They have the opportunity to describe it and say, look, here's what he said during your deposition in this case and here's how it conflicts. Did you participate in that conference call? I did not personally. I don't think appellate counsel does. You described the conference call as being extremely brief, where they were really unable to go into much detail. Since this is not transcribed and there's no description in any document about what the nature of the call was like, you're describing it as though you think it was some sort of thorough vetting where there was an opportunity presented. Do you have any evidence to support your statement to this court as a fact, which you just made, that there was an opportunity for them to present in this conference call a back-and-forth discussion of exactly what was inconsistent? Well, Your Honor, a couple of responses. One, I'm giving you how these conference calls normally work on this. I didn't say how they normally work. I said how it worked in this case. Sure. So you're not making any representation about how it transcribed in this case. No, Your Honor, we do. So, Your Honor, there is actually some basis to make the representation. One, I communicated with the attorneys who did do this, so I have their version of what happened, which I'll relay to you. But also we have in writing from Ultratech's counsel, what they submitted after the notice of appeal was filed in this case so that the PTAB no longer had jurisdiction to expand the record, they filed what they called the verified recollections of counsel, which they gave their version of what happened in the conference call. Is this part of the record? It's not part of the record because they filed it after the notice of appeal had been filed in the PTAB, and they never went to this court under FRAP 10 to have it admitted in this court. Now, what that description entails, and this is from their own counsel, not our side. It's the one-sided dispute. They say that they were asked to present to describe the conflicting testimony. They were given that opportunity, and they did describe it during the call. This is not a record below, and not only did you point out that she didn't supplement our record on appeal with it, but I assume you didn't either. So now you'd like to rely on something that's not a record that you also had an opportunity to put into our record. No, Your Honor. I'm not trying to rely on it. It's just you were asking what happened during that call, and so I'm just trying to describe the only basis I have. So you're going to tell me what happened in the call from non-recorded evidence? No, I don't want to, Your Honor. You asked her what happened during the call, and you asked me is there any basis to say that they had an opportunity to describe. The writing that they submitted to the PTAB did. Well, because I was trying to understand. You seem to be suggesting that there's a general process. Just out of curiosity, how many of these PTAB conference calls have you personally participated in? I personally have not participated in them. So what is your basis for standing in front of this court and representing to us what the normal process is on these conferences? I talked to the PTO attorneys who do this day in and day out, and I talked to our IPR attorneys who do this day in and day out. The other part, Your Honor, if I may, to the extent there are deficiencies. So conference calls like this are occurring, according to you, day in and day out, where the PTO is refusing to consider evidence of inconsistent statements made by the very expert whose testimony is given in an IPR in which they rely on dozens of times to happen. These exact kinds of scenarios happen day in and day out. Your Honor, I'm not saying the particular facts in this case. What I'm saying is they have these conference calls to expand the record, to have late discovery, to reopen proceedings. That, in fact, does happen all the time. Just out of curiosity, where does the authority for these conference calls come from? Your Honor, it's set forth in the procedure guide that the PTO puts out for the practice guide. Is that a regulation? I'll let the PTO speak to the details of how it was implemented. It is in the Fed Reg. It's published in the Federal Register. I'm not asking whether it's in the Federal Register. I'm asking if it is, in fact, a regulation. I don't think it undergoes notice and comment, Your Honor. That's not what I'm asking. It's under notice and comment. I'm asking if it's a regulation under the APA. Sure. It is not a notice and comment regulation. It is in the Federal Register. So it's not a notice and comment regulation, and yet 316A.3, which you submitted to us and articulated was the authority for the PTO to do all of this, says, and I will quote, Regulations. The Director shall prescribe regulations establishing procedure for the submission of supplemental information after the petition is filed. And what you're telling me is none of what you're describing is in a regulation. No, Your Honor. I'm sorry. That part about the conference call. There is a procedure that is in regulation. The conference call? I'd have to look at the regulation to see if it sets forth exact about the conference call. Okay. The regulation does, they did promulgate a regulation that said, look, if you file it within a certain amount of time, you can file the motion. If you file it after that certain amount of time, then you have to move to seek leave in order to do the motion. That's the standard that is used in assessing whether or not leave should be granted. So that is also set forth in the regulation itself, which is interest of justice. Okay. But that standard applies to the motion itself, not the request to file a motion. Sure. And so they make a determination at the hearing is have they given their best case to suggest that they can meet that standard such that it justifies at that late stage. Remember, we're three weeks before the hearing now. At that late stage to reopen the record, have briefing on this, and have potentially yet another deposition of Ocho Grosso, who had already been deposed twice in these proceedings. How can they possibly assess whether they've made a best case for an interest of justice determination when the process does not entail submission of the actual documents that we're talking about? Your Honor, it is true that in certain cases, closed cases, you may actually have to study the materials and figure out whether, you know, how contradictory the alleged contradiction is. Is it material enough? But that's why they have these hearings. They try to give the counsel a chance to say, okay, well, you know, explain to us how material it is. And in their – I don't want to go outside the record, but if you want to ask what happened, you asked opposing counsel did they give an explanation for the denial. And according to their own account, they did give an explanation in the hearing. So, again, what we have here – it's true, we have a lack of record. There's nothing for me to review. Your Honor, but the part of the reason – the part of the reason there is nothing to review – If you say that they should have hired a court reporter, my head will explode. Okay, Your Honor. Okay. I won't say that. But what I will say is the PTO points out is that – and this is the word from the PTO's brief that has experience in this – that these conference calls are routinely transcribed. And I talked to our IPR attorneys who do this. But so what? In order to preserve – Even if it's transcribed, that's not part of the record. Well, it is, yes. If it's transcribed, it is routinely entered into the IPR record. Wait, wait, wait, wait, wait. It's routinely entered, but someone has to make a motion to enter it. It's not automatically part of the record. Your Honor, yes, and I discussed this with both the PTO and our IPR attorneys. They're aware of no instance – and, in fact, the PTO asks in these calls, do you have a reporter to transcribe it? And we're aware of no case in which that has ever been denied to be entered into the record. They don't cite any case, and it's routine. Well, because you've never participated in one of these things, so of course you're not familiar with any case in which it's been denied. You're not familiar with any case in which it's been granted. Well, I am, Your Honor. I've talked to both the PTO and all of our attorneys who do this, and it's routine is the word. Everyone knows that if you want to preserve the appellate record for these conference calls, you have it transcribed. Just out of curiosity, where is that? Is that also in the practice, guys? You can have a court reporter transcribe all of these random conference calls? Your Honor, it's listed in the IPR decisions. They talk about that process. It's not in the – there are other – there are practice guides that talk about transcription, not specifically with respect to this conference call, but, again, as the PTO has represented. There is no document in any place that the PTO has articulated, not even in that practice guide, which you say is published in the Federal Register, even though it's not a regulation and wasn't subject to notice and comment. There is no place anywhere in existence where the PTO has made people publicly aware of the fact that they are entitled to have these things transcribed. It is in writing in IPR decisions. Random IPR decisions have granted requests to do that, but if there's somewhere where the PTO has informed people that that is something that they are permitted to request them do. Not in a practice guide sort of setting, but in IPR decisions, they describe – In regulation? No. In rulemaking? No, Your Honor. The only place they do this is in IPR decisions. They describe this process. In presidential IPR decisions? Your Honor, there's several cited in the PTO's brief. Okay. Then no, Your Honor. Even if, Your Honor – Let's get to the substance, if you may. This is of concern. We'll take it up with the PTO. Okay. Can I make – Let's very briefly turn to – the concern, of course, is the apparent inconsistent testimony. And was there any attempt made by either side to respond to the inconsistency or to the reason why – when the PTO declined to grant the motion, declined to receive it or apparently to consider it? So, yes, there's, I guess, a couple material things, and I'm glad you asked that question. One is, it was asked during the other side's argument, did you have a chance to depose Ocho Grosso after this trial testimony happened? The answer is yes. There was a deposition in the ninth IPR that happened after the trial testimony. And if you look at footnote two in their reply brief, what they say is, we didn't raise this motion to supplement the record because we had an opportunity to depose Ocho Grosso in the ninth IPR. So if these contradictions were so material, you would have expected it to surface in the ninth IPR. It does not come up. We reviewed the ninth IPR deposition transcript. They don't ask him about any of the inconsistencies that they talk about. So it's just not true that they didn't have an opportunity to depose Ocho Grosso after this trial transcript. That's true in the first state, but in the ninth, it's the same witness. And if it goes to credibility, presumably they would have brought up the contradiction, it didn't happen. And Judge Newman, to answer the other part of the question, one material thing that they haven't disclosed to this court is that trial testimony is readily publicly available for this court. And we didn't realize this at the briefing stage, but it's an absolute critical point. Even if this does raise due process concern or procedural concerns, this is probably the worst vehicle to find any sort of procedural violation because the very testimony that they say that it was impossible to bring to this court is publicly available on PACER. In the very case that they cite on page one in their brief, they cite another document from that same case, another docket entry, it's docket entry 697, 720, and 759 in that parallel district court litigation. It's publicly available on PACER. If the contradictions were so – their principal claim before this court is a procedural one. Are you suggesting that when something is publicly available, then the appellate court is free to reference it and make fact findings about it, even though it's not in the record and the lower court expressly refused to allow it to be put into the record? Well, Your Honor – I'm wondering. I mean, the only vehicle it would seem to me would be judicial notice. But that would only allow judicial notice for things like December 25th is Christmas, right? Does judicial notice allow me to go to PACER, get that document, and then decide whether or not I think there were, in fact, inconsistencies in the testimony? Your Honor, judicial notice does extend to the filings themselves, including the trial transcripts. The fact of filings. The fact, not the substance. Right. Well, Your Honor, their principal objection here is that there was no way for them to get the substance of that trial testimony so that they could not – so that they couldn't make the contradiction argument. What they said is, we were deprived of the opportunity to make and show the material contribution. We know that the PTAB didn't find that there was material enough contributions to admit the testimony. What they say is, they're deprived of the opportunity of appellate review for this court to look at that testimony and make a decision as to whether it was material enough to undermine Ochoa Gross' testimony. That's the claim they want to bring, that the PTAB abused its discretion and should have let them admit this testimony because it materially contradicts. What they say is, we couldn't do that because we couldn't point the court to the testimony and show them the material contradiction. But they could. It's on PACER. They can cite, they can quote the exact sentences and line it up against the testimony. That's what they want to do. If this is remanded as for a procedural violation, that's precisely what they want to do, is they want to quote the testimony and show the contradiction. They could have done that in their brief, and they can do that now. I just want to make the court aware that this material is, in fact – it's not impossible to bring it before the court. It's, in fact, on the court. They didn't move before the notice of appeal. They didn't move after the notice of appeal, and they don't cite it there. But, Judge Newman, I'll turn to the merits now, if the court desires. I'll start with secondary considerations, which is the argument that they raised first. And, of course, secondary considerations, Ultratech's burden to show the nexus between the capital service that they have and the patented claims. And it's important to remember, and it doesn't get lost in this briefing, that the secondary consideration argument was denied on two independent grounds. There was a procedural ground in the first eight of the nine ITRs for denying the argument because they didn't properly raise the argument. And that, essentially, as the PTAB noted, they spent about a page and a half, three legal boilerplate paragraphs in laying out secondary considerations. And if I can just read for you from the PTAB's description, and this applies to the first eight of the nine ITRs, as to why they didn't properly make the secondary consideration argument. And this was also aired in the hearing transcript, where the other side said, yes, it could have been made in greater detail. And here's what the PTAB says. And this is at JA44 in the 1713, in the third appeal. In the 1713 appeal, this is JA44. But, again, this argument applies to the first eight of the nine ITRs. And here's what it says. It says, patent owners' arguments and explanations on secondary considerations are three paragraphs that contain virtually no substance. The first paragraph is legal boilerplate. The third paragraph is a generic conclusion. The second paragraph is, at best, a list of common things that could be raised during a secondary considerations discussion, but it contains no meaningful argument. Patent owners' only citations are the three exhibits in their entirety with no meaningful discussion. Such a course of action by patent owners does not comply with our rules, which prohibit incorporation by reference and requires specific arguments to be made in their briefs. And then it goes on to say on the next page of JA45, patent owners cited to no paragraphs or portions of the evidence that sought to rely on and develop no cogent arguments. Instead, it listed the names of common arguments made in nearly all secondary consideration analyses. We require the parties' papers to contain more than mere pleadings. So for the first eight of the nine ITRs, what the court said is they didn't present the argument consistent with the rules. It was legal boilerplate. You can't just cite to dozens of pages without any pin sites and just make legal boilerplate arguments. So on that ground alone, the first eight of the nine secondary consideration arguments fails along the lines of the PTAB arguments. Now, in the ninth IPR, Ultratech did change its tab. Instead of doing the three paragraphs of legal boilerplate, it provided a regular argument on secondary considerations in its brief. That's only in the ninth IPR. Once it did that, the PTAB did address it in 15 pages of its final written decision. That's in the 1713 IPR, and that's JA3265 to 3279. So once Ultratech actually spelled out its arguments, you get a 15-page detailed discussion of why they didn't meet their burden on secondary considerations evidence. And they say that, look, the claim charts that they presented from their expert Ludwig show embodiment. I encourage the court to look at the claim chart itself, and this is at 1706. Just to pick one of the claim charts, there's three of them that go for each of the patents here. 1706 JA2437 to 2444, this does not look like a claim chart that any court would accept. It doesn't have any manuals, no documentation, no pictures, no diagrams. It's a chart that has nearly verbatim language for each entry that we quote in our brief. I encourage you to look at that claim chart. It's no surprise that the PTAB said that that is not a sufficient sort of evidence to prove embodiment when you just have this conclusory wrote verbatim without any supporting documentation. It's just not the sort of evidence that you see in these sorts of cases to show embodiment. Moreover, beyond the fact that they didn't make their threshold burden of showing embodiment based on that conclusory claim chart, in that last IPR at JA3270, the PTAB correctly points out that not all of the models of telephones in their products, the new CapTel service, actually has all of the elements of the claims. Remember, CapTel service, their product, is not a monolithic. It's not like a single product. It's a group of phones that evolved over time, over a decade. And they point to, at JA3270, model 100. And they say, look, the expert doesn't show that model 100 actually included all of the elements of the claim below. And in particular, we know that model 100 does not have two-line functionality. That's one of the elements that is part of their claim. There's three key elements, revoicing, two-line functionality, and simultaneous voice and text. It doesn't have two lines. So not only did they not meet their burden of showing embodiment based on the conclusory claim chart, but then, in fact, one of the models of the PTAB found does not actually have the element. And so there is no embodiment there. And we're far from the category of inventions that are coextensive. Not only is it under-inclusive, the CapTel service, because it doesn't embody in certain models all of the claim features, but it's also over-inclusive. Remember, there's certain claims here that only have one of the claim features, like revoicing, and yet they're pointing to a service that they say has all three features. So to trace the commercial success to a particular patent claim that only has one of the three features is tough to do. Even beyond the claim features, there are lots of unclaimed features in the device, and the PTAB points to these, at JA3268. And it says, look, there's a strong reason to believe that the success that this service enjoyed is not from just the claim features, but due to other things like caption calls, actually, the marketing done by caption calls to tout the service. Also, the screen size. Sales jumped once you made the screen size bigger so that people could read these captions easier. So there's all sorts of evidence. This is one of the most fulsome analyses of secondary consideration evidence that you'll see from the PTAB, 15 pages where they walk through the various defects or why they didn't make enough of a showing to get the presumption of nexus that they seek. Your Honor, in the couple minutes that I have remaining, maybe I'll turn to the same construction argument that you asked about. Okay, on training. So I guess there's two elements to that, the one and only one. When you're talking about broadest reasonable construction, to say that the software has to be trained to only a single individual is not only supported by the claims and specification, which never say it can only be one and no other assistant, but also by common sense. Often these call centers are housed in a particular city with an accent, either a southern accent, a southern city, or in India with an Indian accent. And so it makes sense that you would have it trained to particular call agents in a particular office. And so to say that the claim construction requires under the broadest reasonable interpretation that it be just one assistant, the PTAB correctly rejected that argument. But even if there's any doubt that this could apply, and remember, our construction is it could apply to just one call assistant or to a group of call assistants, right? They're saying it has to be just one. But if there's any doubt about that, at JA32, they say the PTAB never made a holding that Ryan anticipates if it is just one call center. That's not true. At JA32, Ryan specifically says... Yes, this is the first. This is in the 1706, and it's at JA32. It says, moreover, we are not persuaded by patent owner that a person of ordinary skill in the art would interpret Ryan as only disclosing software written for a group of people. Patent owner's argument is unpersuasive because it relies on the level of ordinary skill in the art as reflected in the prior art filed in 1994, not 1997. And so there was an alternative argument that the board made that says there isn't a reason to read it as just limited to a group. It could also do one person. And then as to the timing and the few seconds that I have left, as to the timing argument, Your Honor, there's no definition of training in any of the materials. There's no reason to believe that software that's designed at the coding stage is not also trained. In order to get an accent like a southern accent, even if it's done at the coding stage, you still have to go through the same training process that the software then recognizes that it's a southern accent by bringing people in the lab and making that accent. So the question is, does it have to be done before or after the PTAB? Part of the problem is that neither the patents nor the references really make much of a discussion about either training or designing. That's a fair point, Your Honor, and under broadest reasonable interpretation, we don't think there's any reason to temporally limit it to post-coding training, given that there's no discussion about that, as you point out, in the patent itself. And the expert, of course, on which the PTAB relied did testify that it would apply to the pre-coding stage as well, and that's at least substantial evidence, Your Honor. Okay. Anything else for Mr. Shaw? Okay, then we'll hear from the office. Thank you. May I please have the court? Your Honor, the problem really here is that Ultratech was a dollar short and a day late at every turn in this proceeding. They had a conference call, the board provided them with a conference call to explain what it is that they wanted to include, and they gave them a full hearing to explain their position. They asked them to give them their best shot, and in the end, it just wasn't sufficient. Why? What's the whole purpose of this conference call? Why not simply provide an opportunity to file a motion? Because, Your Honor, these proceedings are constrained by time. There is a mandate to have these proceedings completed within one year. The types of issues that parties routinely raise are not these types of issues. The types of issues that normally come up are, we need three extra pages. We can't agree on an extension of time. We want to file and apply. So those are not the types of issues. If it's done in writing, there's a record, and there's something people can look at if there's a challenge as to whether there's a proper decision or not. But doing this, having a request to file a motion without a record, opens up a can of worms. Because here we are with the very dilemma that that process creates. It might seem like it's disjunctive and perhaps a little bit clumsy, but honestly, it is the most efficient way to handle the types of issues that come up in proceedings on a regular basis. Why does it not open the door to arbitrary rulings by the Patent Office that are not subject to review? We're not saying that the decisions are subject to review. The conference call can be held, and the Patent Office says, well, we deny your motion. That's the end of that. No record, nothing to review. That's not what happened here, Your Honor, and that's not what happens at the agency. The agency is required to articulate some reasoning for its decision, and the board did that here. The board explained that this motion or they wanted to include this evidence too late into the proceeding. Where did the board say that precisely? The page that you had pointed to, Judge Moore, APP Act 6394. Okay, I'm there. The first sentence says that this conference call took place, but it took place after discovery and briefing were complete and a month before oral hearing. It was actually just less than two weeks. I'm sorry, I'm missing that. Where is that? The first sentence of the – On November 4th? Yes. November 14th? Which is the date of the conference call. After discovery and briefing were complete and a month before oral hearing, we held a conference call. How is that an explanation that we have decided, in the interest of justice, it's too close to the hearing to allow this process? Because of the type of motion that they were trying to make. They wanted to include alleged inconsistent statements by the other opposition's experts. That's not the kind of thing that they – I mean, they tried to say, oh, it's just, you know, they could have included them as observations. But observations, you don't even need permission to file observations. They could have done that automatically, right, according to the scheduling order. What they were trying to do was to use – almost trying to impeach the expert, using the deposition testimony during the IPR. In the interest of justice, wouldn't that be something that the normal adjudicator or fact finder would care about? The board relies on Mr. Ochoa-Grosso's testimony dozens of times. I'm not certain that it did, Your Honor. I know you pointed to a few instances where the board said, we credit Mr. Ochoa-Grosso's testimony over one of their experts' testimony, one of the other experts' testimony. But that doesn't mean that they are relying on that testimony. I heard you saying, this is what one side said, this is what the other side said. I agree with this side. I would have come to the same conclusion. 6383 of the JA. Let's start with that one because this is 6383 of the JA, which is IPR 2013-550. The reason I'm picking this one out of the dozens of references, all of which I have flagged so we could spend a lot of time going through them if we needed to, but I don't know that it's a good plan. I'm picking this one because this one's on exactly the point that they say he gave inconsistent testimony on. It's on the McLaughlin reference. And what do they say? Why don't you tell me what they say. Why don't you start in the we are persuaded line since your representation to me was just that you think the board just credited it but didn't actually rely on it. So what do they say there? I guess you're reading from the fifth line down? Yeah. We are persuaded by Mr. Ochoa-Grosso's testimony that a person of ordinary skill in the art would consider Ms. Laughlin to be disclosing a device capable of all these features described therein. It's my understanding that it's the exact point on the exact reference that he supposedly gave inconsistent testimony on. And so your statement to me a minute ago was you're not so sure the board really did rely on Mr. Ochoa-Grosso. Judge Moore, I was just responding to your point that they relied on Mr. Ochoa-Grosso's testimony heavily. I don't believe that the board did rely on it heavily. Okay. Perhaps one example. Because I've got every single one of them flagged, and there are three dozen references. Your Honor, we're talking about board judges that are experts in this area. They can come to their own conclusions about what the prior art means to assume that they would. They could, but they didn't here. Instead, they relied heavily on the testimony of an expert that supposedly gave inconsistent. Supposedly. That's the key here. They alleged. That's not a fair characterization of it, Your Honor. They submitted the testimony? They don't have to physically have the testimony in front of them for them to have considered it. The way a conference call is organized is that the movement gets the opportunity to give the board their best shot as to why there is sufficient evidence here. There's enough here to go ahead and proceed on the motion. It's an issue of efficiency. There's no point in going through with a motion, an opposition, and a response, and whatever else this particular type of motion would have entailed, which might have been an additional deposition. This is all just speculation. It's not speculation, Your Honor. Wait a minute. They made a decision in this case based on a piece of paper, a written declaration by Mr. Ochoa-Rosa. Nothing else. They never heard his testimony, correct? He did not present testimony in any one of the nine hearings. He did not present live testimony. Yes, but that is not how IPOs are organized. Wait. So all the board did was read the declaration of this guy. How hard would it have been for them to read the corresponding pages that supposedly amounted to inconsistent testimony in written form? They also read the cross-examination of this guy's deposition testimony that Ultratech provided. Ultratech had multiple ample opportunities to depose Mr. Ochoa-Rosa and to file cross-examination observations on that deposition. There were at least four times before the oral hearing where they had the opportunity to challenge Mr. Ochoa-Rosa's testimony. The fact that they didn't get anywhere in the IPRs does not necessarily mean that the board, you know, erred by not allowing this other extrinsic evidence. I don't understand how these processes normally work. What I'm not interested in doing here, just to be clear, is if I were to say that this was an arbitrary and capricious act, I'm not interested. I'm a little concerned about taking such a ruling so far as to say, no more conference call, you're trying to hide stuff. Now, one of the things you said, because I do want to be careful, one of the things you said was this isn't the kind of motion that is normally what's done in these conference calls. Normally it's can I have three extra pages, can I have three extra days, whatever. Is that correct? Because maybe there's some reason to suggest that certain kinds of evidentiary motion ought to be subject to more process or at least some record or at least some written decision, but the routine and mundane three more days, three more pages, whatever stuff doesn't have to be. Do you see where I'm going? If you're arbitrary and capricious in this case, I'm not looking to say you're arbitrary and capricious in every case, because what you've explained to me, and I want to make sure I understand correctly, is this type of substantive motion, as I look at it, is not the kind of thing the board's normally doing in conference calls. I think that that is fair. The relative frequency with which the conference call is used for mundane, routine issues that are never again at all even revisited is really the nature of the conference call. The fact that this, in hindsight, became a bigger issue than it was at the time is a different story, and it's not common necessarily. That's what I was hoping. But at the same time, that doesn't mean that what the board provided in this decision isn't sufficient explanation. The board said discovery is complete. This is the type of motion that requires discovery, and that makes sense. You cannot excuse somebody of making an inconsistent statement without providing them the opportunity to explain why. And once they provide an explanation, what happens next? The opposing party gets the opportunity to then depose them on their explanation. This isn't just a one-time, please let us include this transcript from the jury trial into the record. That's not what this is about. It entails a lot more steps, and there just wasn't enough time. And time is a substantive determination. But the board didn't say any of that. You only said it in your brief. The board didn't say anything. No, Your Honor, I just pointed you to where they said it. They said discovery was complete. That's true for every late submission. Every late submission, by virtue of your regulation, would be after discovery is complete. And briefing was closed. You're suggesting to me that I should interpret from that. Every late submission should and can automatically be rejected without review. No, Your Honor, I'm just explaining to you what the board was explaining in the context of this particular type of motion. On November 4th, after discovery, Pat and I requested authorization for late submission of evidence. I mean, that's a factual statement. That's their basis for why they denied, in the interest of justice, chose to deny this. I should interpret that first statement, which is a factual statement about the day on which something happened, as their decision. Yes, Your Honor, because there's more to it than that. There's a lot packed into that one sentence. The board is explaining that we are just a couple of- There's actually a lot I can't see. It's invisible. The reason that we can't see it, Your Honor, is because they never got a court report. I know you said not to mention it because your head's going to explode once we mention it, but that is just a fact. Where does the Patent Office explain to people that they have the right to have a court reporter transcribe these conference calls? In the practice guide- Oh, where? No, no, no. I would like to just- You have to get authorization to file a motion. That's also in the rules. The rules for this particular type of motion, right, you have to get pre-authorization. How do you go about getting pre-authorization? You have to set up a conference call with the board. That appears, by the way, only in the practice guide, right? Yeah, that's right. The conference call with the board. That's right. How do you do that? You do that in two ways. You can either just directly call the board or you can email the board. You can call the board and say, this is the issue, this is what I'm trying to include or exclude. I've spoken to the other side, they agree or disagree, and these are the times when both parties are available. It is meant to be completely ministerial. Where does the practice guide explain what you said it explains about you can hire a court reporter to record the conversation? It is customary for parties to hire a court reporter. Everybody does. Everybody has a court reporter present on a conference call. They said in their brief they didn't know this until after the fact. It's quite possible that it was a learning curve for this party at that time. Just to be clear, you, the PTO, say it nowhere in writing. You say it nowhere. It's not on your website. It's not in your practice guide. It's not in your regulations. It's not in your rulemaking. Is this correct? Do you have to say it anywhere? Can you point me to any place? You can answer no questions. No, we do not say that you can hire a court reporter, but that is just understood. This is litigation. Parties know that if they want to preserve the arguments that they make in an oral motion where nothing else is before them, where the board is saying, please orally explain to me why you think you have sufficient, there's a sufficiency issue. Is there enough here for us to go ahead and actually brief this motion, which takes time, which is expensive, which causes delays? Is there a reason to do that? Because if there isn't, there's no point in going through with it. The district courts do this also. The District of Delaware has local rules where the judges require parties to file letter briefs to the court explaining why they would want to file a motion for summary judgment. They're not allowed to do that automatically. It's a two-step process, just like the way this is a two-step process. The court's decision on whether to allow it or not is recorded. That's a different issue. The issue there is, yes, perhaps they're allowed to enter it into the record there, but here the reason it's not part of the record is because they failed to get a court reporter. If there was a court reporter here, we wouldn't be having this discussion. You were saying it's not recorded. You see we have the phone here. Our next argument is going to be by telephone, and it will be recorded and transcribed. Here we have a case about voice recognition and all sorts of things. None of that is recorded so that some subsequent reporter could, if there's a dispute, as there is now, transcribe it. The office does none of that. Is that right? The office does not get a court reporter. It is up to the parties to get a court reporter. It's not transcribed. It's not recorded. Not by the office. It is not, but it is up to the parties to do it. If the parties choose to have a court reporter, at the beginning of every conference call that I listened in on, the presiding board judge asks every party to introduce themselves and make their appearances, introduces the other two judges, then asks if there's a court reporter online, and then if there's a court reporter online, make sure that the court reporter can hear everybody's voice about what is transcribed is correct. We've been focusing on an extraordinarily questionable procedure, but you're well over time. Would you take a minute or two to try and explain or rationalize why, when the board is told that there is inconsistent sworn testimony at trial in the district court, don't bother, we're not going to look at it? That's not what the board said here. The board said, don't bother, we're not going to look at it. That's not what the board said here. It's implicit in the board's finding that this is way, way too late to include it, is the finding that what they had here was not really, didn't necessarily got live to the interest of the auditor. Too late to consider inconsistent statements? They considered it, Your Honor. They considered it in the hearing. The party had the opportunity to explain what it is that they were trying to introduce, right? And to me, this has much to do about nothing, to be honest with you, because in the ninth IPR where they could have introduced this testimony because they said it hurt the expert's credibility to such an extent that it required a duty of candor from the other side to present it, they didn't even include it. When they could have challenged this testimony, they didn't do it. And that kind of shows you that perhaps there really wasn't anything to begin with in the first place. And perhaps the board understood that during that hearing. Perhaps the board also further understood that they had multiple opportunities to get the, to depose Mr. Orsiero-Grosso, and to cross-examine him, and to submit all that information. And they just failed. Okay. Any more questions? Okay. Thank you. Thank you, Ms. Rasheed. Okay, Ms. Newell, you have, let's make it five minutes. Thank you. Can you tell us about the ninth proceeding? Yes, Your Honor. That was one of the things I wanted to bring up. These proceedings, you have incredibly limited time and limited pages, which is, you know, part and parcel with you didn't describe enough in your brief about secondary considerations, which I'll get to next. The second 835 patent did not involve either of the references at issue. So we would have had to have taken something like 20 pages to explain, here's Ms. Laughlin, here's Ryan, here's the testimony, here's how it's inconsistent. I do believe that that is highly pertinent to his credibility. But with these procedures, with such little due process, the notion of not going to the merits of the prior art references for this patent to eat up pages to go to that, that is why. And rather than explain it, you wanted to file the document itself. That is precisely correct. One quick issue on the transcript. It feels like this is a late IPR. This was one of the first IPRs. This case has been stayed a number of times, this appeal rather. So the notion that this was common practice wasn't true at the time. Going to the issue of nexus and waiver. The board actually, it criticized Ultratext. There's no doubt about it. Practically speaking, could we have done a better job in the brief? Probably could we have gotten it all in with those pages? No, it would have been impossible. But the board didn't hold waiver. It criticized Ultratext, but it didn't hold waiver. Caption Call argued not embodiment, but they did argue nexus and secondary considerations. The board, on a motion for rehearing, which is found in Appendix 1706, Appendix 71, when we raised the issue of secondary considerations on rehearing, it didn't discuss waiver. What it said is we analyzed your evidence and we didn't, we weren't persuaded by it. Now, fundamentally what's important is the evidence that the board didn't believe was on primarily embodiment. Caption Call didn't dispute it. You heard counsel make reference to CapTel 100 versus 200. First of all, Mr. Ludwig in the 835, which is the two-line patent, expressly put in his report that for secondary considerations, he was only considering the 200 and not the 100. There is an issue with some of the minutes of the 100 would go, arguably, into the commercial success. That was a fact brought to the board's attention by Ultratext. It wasn't relied upon by their expert in criticizing secondary considerations. You heard the comment about the screen size that the board took issue of. That wasn't a Caption Call argument. Once again, that was in Mr. Ludwig's report. When he was analyzing what drove commercial success, he accounted for these things. And the board took it upon itself to be an advocate for Caption Call and say, if, oh, it proved the commercial success, it could have been a screen size. This is one of those common sense moments. The size of a screen driving up dramatically sales of a captioned telephone as opposed to the fact that with these inventions, not 50 words a minute, but 200 words a minute. The idea that it's the screen size versus you can call 911 and actually have captions from the operator. The idea that you have 98% accuracy instead of 90% accuracy, that's what drives commercial success. And we do have support for that in the record because Mr. Ludwig wasn't the only one who talked about the needs of the hard-of-hearing community. That was Ms. Patak. That was Ms. Phelps. They gave testimony as to what the needs of the hard-of-hearing community were and how these inventions satisfied those needs. The board totally disregarded that on a claim of embodiment which was not raised by Caption Call. A reference was made by the PTO's counsel that the PTAB is a bunch of experts in the art. That's actually not true. They're not experts in the art. But in this case, they decided they were. They could read the minute reports better than Mr. Ludwig. They know why people buy captioned telephones, screen size, versus having accurate captions, being able to have a job interview. This is the fundamental problem with how this board treated these proceedings. They thought better. That is not, under PPC, the way the PTAB is supposed to operate. They're supposed to be neutral. They're supposed to be fair. They were not in these matters. Okay. Thank you. Thank you. Case is taken under submission.